Thank you. You may be seated. Final case for today is 2017-50572 Brandon Lee Moon v. City of El Paso. May it please the Court. Brandon Moon spent 17 years in prison for a rape that he did not commit. He was exonerated when DNA testing proved he was innocent. Moon was put in prison by the biased work of the El Paso police. All along, Moon maintained his innocence, and he sought DNA testing to prove it. In 1996, those efforts were thwarted on two fronts. First, by the county clerk's systemic disorganization. Second, by the district attorney's failure to inform Moon of the imperative need for follow-up testing. Fast forward eight years. In 2004, Moon got DNA testing that proved he was innocent. Once released from prison, Moon brought this lawsuit seeking redress against the actors who caused and prolonged his wrongful imprisonment. But that is not the end of the ways the justice system has failed Moon. Because at that point, this case then sat at the district court for more than ten years with a stay-on-merits discovery waiting for a ruling at the 12b6 stage, which brings us to today. This appeal involves three claims against three sets of defendants. First, the city defendants. Second, the county defendants. Third, ADA Davis. I'll first address Moon's claims against the city defendants. Moon asserts a state law cause of action for false imprisonment against the city defendants. This is a straightforward, plain vanilla, eerie issue. State substantive law provides the rule of accrual for a state law cause of action. Do we have intermediate state law court of appeals that tell us it's a continuing tort? Is that the authority? So it's persuasive but not binding? We do, Judge Elrod. This court can make an educated, eerie guess. But on that point, appellees do not dispute that that's the law of Texas. At page 7 of the detective's brief, they take the position that Texas law provides that false imprisonment is a continuing tort. But need this court reach that issue? Yes, Your Honor. There are multiple intermediate courts of appeals in Texas that have held that false imprisonment is a continuing tort, the cause of action for which accrues upon release from detention. But we could – if we agreed with you that it's supposed to be state and not federal and that they do have a – that they – state and federal, we could send it back and let the district court do that analysis? Or are you saying we should do that analysis? Your Honor, I believe that issue is before this court to decide. But we would not be opposed to this court remanding with instructions to consider the limitations analysis in line with what everyone agrees Texas law to say. To be clear, this court has never squarely addressed – You're asserting that under the supplemental jurisdiction of this court, right? Yes, Your Honor. These are pendent state law claims that were brought alongside of Section 1983 claims. So we are not obligated to even address those, right? Well, the district court did exercise jurisdiction over these claims, and it dismissed them at the 12B6 stage. And that's the dismissal from which we're appealing. So we would have to – if we didn't choose to address – if the district court was to have an option, we would send it back and say that this is – these are state law and this is the other standard and you may choose to exercise supplemental or not. But the court has to reverse its – we have to reverse the 12B6. Do you agree with our position, Your Honor? Yes. The court must reverse the dismissal on 12B6 grounds. It would be, I suppose, at this discretion whether this court then enters a judgment on the 12B6 saying that these claims are not barred by limitations or remands to the district court for consideration in the first instance of a proper analysis of the rule. If we denied the federal claims, we would simply say that we do not address – or abuse its discretion in accepting the state claims and they're still viable, remanded to the district court. I believe that is one avenue that this court could take, Your Honor, yes. We would respectfully request that this court reverse outright and remand with instructions for further proceedings on those claims carried on to the merits stage. To be clear, this court has never addressed the precise issue that's before it today on the claims against the city defendants. The question, as Your Honors are bringing into relief, is what rule of accrual applies to a purely state law cause of action that happens to be brought alongside Section 1983 causes of action that arise from similar facts? And we have to follow the Texas rule. This court must follow the Texas rule, and what I'm getting at is in the handful of prior cases from this court that address similar situations that involve purely state law claims that happen to be brought alongside Section 1983 claims, this court has never fully articulated the correct analysis. It's really never had an opportunity to do so. Okay. On the claims against the city defendants, then, Your Honor, we would respectfully request—well, backing up one minute. Moon was released from detention in December of 2004. He filed this lawsuit in October of 2006. So applying the proper rule of accrual from Texas is considered not barred by limitations. And so we would respectfully request that this court reverse the district court. And you say the proper rule, but it's really just the rule as intermediate courts have fashioned it or recognized it, nothing that the Supreme Court of Texas has ever addressed or conclusively stated. Judge Willett, the Supreme Court has never squarely addressed this question, but it has come awfully close to endorsing the rule that is set out in the intermediate appellate courts. I mean, three years ago the court said we've neither—how'd they put it? We've neither endorsed nor addressed the continuing tort doctrine. Yes, Your Honor, that's correct. But they also dropped a footnote and said although false imprisonment, the accrual rule for false imprisonment is not before us today, here are some examples of the ways that intermediate courts of appeals have addressed the continuing tort doctrine in Texas. And the Supreme Court gave us no reason to doubt that that is the way the stream is going in Texas law. Turning to Moon's claims against the county defendants, keeping in mind that Merritt's discovery has been stayed to this point, on the facts in the record currently, a reasonable juror could conclude from this record, viewing it in the light most favorable to Moon, that the clerk's policy of disorganization caused— created conditions that caused the failure to locate the critical checkout document in 1996, which set into motion a string of events that violated Moon's right of access to the courts and prolonged his imprisonment. When did he know of the disarray in the clerk's office? Your Honor— Almost from the beginning. I believe the facts that are relevant for this claim would not have been known to him until the limited narrow discovery in this case. And that's because we did not know that the checkout document actually existed until limited immunity discovery was allowed in this lawsuit. I thought his counsel had signed the checkout document. By all accounts, and the clerk— the deputy clerk, Omar Garcia, executed an affidavit to this effect in 1996. In other words, he knew, or he should have known, that it had been filed, but it was now lost. That was my understanding. There was such a document. It is lost. As to Moon, however, I am not sure from this record that we can conclude— If he's charged with knowledge of his counsel. Tom Hughes ceased representing Moon right around the time that the checkout document was signed. And at the time of Moon's fourth habeas, he was proceeding pro se. And so, Your Honor, we haven't briefed the kind of nuanced interplay there, but viewing this record in the light most favorable to Moon as the party not moving for summary judgment or dismissal, I think that this Court could reasonably conclude that Moon did not know of the material facts necessary to bring this claim until the limited discovery was allowed in this case. Moreover, a reasonable juror could conclude that the systemic disarray violated the right of access. Multiple witnesses testified that in 1996, when the clerk's office had a multi-day, multi-week search with more than ten employees, the checkout document could not be found. Now, that fact could cut both ways. On one hand, a reasonable juror may be able to conclude that that means that the county clerk really cared a lot about finding the checkout document. But importantly, and getting more to the core of this Court's inquiry, a reasonable juror could also conclude from that fact that the office was so disorganized that no person could have found the checkout document. You can't say that the office was totally disorganized on the basis that they couldn't find one document. There has to be more than that. Your Honor, we would respectfully encourage the panel, if it has not already, to view the video of the news report that the clerk's successors agreed to sit for. It is located at page 2227 of the record. What will I find there? There's a notation that says CD placed in the file, Your Honor, and my understanding is that from a phone conversation with the clerk of the Fifth Circuit, that this panel would need to call down to the district court and ask that that CD be sent up, but that it is available and is part of the record. And to answer your question, Judge Jolly, what you would see is a sitting clerk of El Paso County walking through a labyrinth of not labeled, strewn about boxes and evidence with absolutely no system of filing, record keeping, or organization. It leaves little doubt as to why the checkout document could not be located in 96 if you can put your eyes on what the inside of that building looked like. Let me ask you whether the fact that Moon's counsel agreed to be totally responsible for the evidence, for the DNA evidence, when he checked it out, how does that play into the argument? Judge Jolly, I think you're referring to the stipulation that Moon's counsel signed in order to check out the evidence. There are two truths to keep in mind about the stipulation. I mean, is it relevant? I'm asking that first. As an initial matter, it's not relevant, Your Honor. And here's why. There was no break in the chain of custody. That is a fact we know today. There was no break in the chain, so the stipulation doesn't apply in the first place. The evidence went from proper custodian to proper custodian to proper custodian, and there was proper documentation for each transfer between each custodian. It went out of the clerk's office to the sheriff. That transfer was documented by the checkout document and the two Reyes affidavits. It then went from the sheriff to LifeCodes for DNA testing. That transfer was documented by the second Reyes report, which I believe is 1032 of the record, and then the next page is a FedEx or UPS airbill showing into LifeCodes, and then LifeCodes evidenced the receipt of the evidence by a letter, by multiple letters, I believe, that said, we received the evidence. There is not a single break in that chain. So the stipulation... The assertion that the harm here should be borne by Moon is illusory in the first place, because the problem is not that there is a break in the chain. The problem is that one of the links in the chain was lost temporarily because of the clerk's disorganization. What about his lawyer? And his lawyer knew that he had checked it out, and I suppose his lawyer knew that he had not returned it or that it had not been returned. Is that a false impression I have? Your Honor, I'm not sure if that's a false impression, but that is not the core of the chain-of-custody argument that the State asserted against Moon. He would have known, it seems, if he's charged with knowledge of the lawyer, which may not be in this case, he would have known that the evidence had never been returned to the clerk's office. And, Judge Dollard, that's what I'm getting at. The chain-of-custody argument that Davis... that the ADA asserted in response to Moon's fourth habeas petition was not premised on the fact that the evidence didn't get back to Moon's attorney. It was premised on, and only on, the lack of that checkout document. Davis testified that had he known the checkout document existed in 1996, he would not have brought that argument. He would have asserted different arguments. We also know... I'm saying that it was all in the hands, and not to bedraggle the point, but it was not in the... Davis... I should have known it was not in the hands of Davis because his other lawyer had it. And that's all I'm saying. It may or may not be the case. I'm not sure I understand your question, Your Honor. Well, it's probably because it's not a good question. Did the lawyer himself have the document when Davis was supposed to have it? Did the lawyer have... The checkout document, Your Honor, at all times, the checkout document was in the county clerk's office. That's where it was when it was created. It was never with the lawyer. No. He had knowledge of it. When it was created... He signed the checkout document. His lawyer knew, his lawyer knew, whoever his lawyer was, if you weren't dead. Yes, Your Honor. He knew that he had signed that document, but the point is that document was in the clerk's office when it was signed in 1988. He knew that he had not returned it. I mean, in other words, I'm just saying that the knowledge of where the DNA evidence was was within the... was within the purview of his team. Your Honor, to really... I'm drawing a distinction here, and I want to be clear about it. The problem is not that they didn't know where the evidence was in 1996. The evidence was with life codes. We know that it did not get sent back to Moon's attorney. That Moon's attorney may have known. The problem is that the checkout document, which at all times was in the district clerk's office, could not be located, and that is the... that is the problem and the only problem that underlies the chain of custody argument against Moon. Okay, we're going to let each side have four more minutes, because you haven't even talked about your other point yet. But did you... I'm sorry, Judge Jolly, did you have something else on this? Or something? But that's not the reason the habeas corpus application was denied. So, why is... It was denied, I mean, it was denied also because the results are not reliable, they don't eliminate him. So even if we don't hold the stipulation against your client, how do you still prevail? Well, and Judge Elrod, that really wades into the essence of a right of access claim. Here are some things we know about the circumstances surrounding the denial of the fourth habeas. One, Davis testified he would not have raised the chain of custody argument had he known the checkout document existed. Two, we know that Davis drafted the findings of fact and conclusions of law that the court signed. Davis testified to that. He drafted those and he presented them to the judge, and the judge signed them mere hours later without a hearing. Because this is a right of access claim, unfortunately, we can't get in a time machine and go back to 1996 and ask how that would have changed the outcome of the fourth habeas. But what we can say is that a reasonable juror could conclude on these facts that that habeas judge might have held a hearing, might have ordered DNA testing, might have appointed counsel for Moon, or some other outcomes. We can't say for sure. But the law doesn't require us to say for sure. Under Christopher v. Harbury, what the law requires us to do is establish three things. First, an arguable and non-frivolous claim. Second, an official action that frustrated litigation of that claim. And third, an injury that cannot be recovered today. And we've established all those three things. First, the arguable and non-frivolous claim that Moon would have brought that was available to him in 1996 was that he was actually innocent of the rape for which he was convicted and DNA evidence would have proved it. Second, an official action that frustrated that claim. The missing checkout document was caused by the clerk's disorganization. And I just spoke a moment ago about all of the ways that the fourth habeas reasonably could have come out in a way that led to Moon's exoneration sooner. And finally, a harm that cannot be rectified today, Moon cannot get those eight years of his life back. There is no cause of action available to him today that would give him recompense for that loss. But there's other evidence of his guilt other than the other evidence of his guilt that the DNA would not answer? Your Honor, it is my understanding and I mean he was identified by in fact that's one of your claims he was falsely identified in a lineup That's right, Your Honor. He was falsely identified in a suggestive lineup. And it is my understanding Did that person also identify him in the courtroom? That I am not aware of. And it might merit noting, Judge Jolly, that this trial occurred before I was born. So I cannot speak from personal experience. But I was going to say not before I was born. But what I can say is that by all accounts in this record there was no physical evidence ever linking Moon to the alleged crime. I believe the crime was committed using a ski mask and some sort of weapon and none of that evidence was ever recovered or tied to Moon. So I believe that it really hangs on in other words, I don't think there is evidence tending to show his guilt that would not be answered by the DNA exoneration. On the Davis claims what is your clearly established law that because turning over exculpatory DNA evidence even assuming, arguendo, that it is truly exculpatory, and there is a debate about that will spot you exculpatory post conviction is not clearly established law during the time so long ago before you were born, is it? Or I guess you were born, that happened after you were born. But even during that time period while that may be a different law now we have all sorts of remedies and innocence that was not there during that time. Let's parse that out a little bit because I want to be clear about the nature of the claim against Davis. It is similar to the claim against the county defendants but it's different. The claim against Davis and for the purpose of this court's review is that a reasonable juror could conclude on this record that Davis' failure to inform Moon of Stanley's report which requested imperative follow-up testing delayed Moon's pursuit of DNA testing which would have proved his innocence and violated his right of access to the courts. This is not a claim that Moon was deprived of Brady material. This is a claim that Moon was delayed in accessing the courts. But what clearly established law says that it was clearly established that he had a duty to inform Moon of Stanley's report during that relevant time period. And Your Honor, we realize that we need to thread a needle here. You have to have a case. Well, the right of access is clearly established in this court today and it has long been clearly established. So a right that you have to disclose some fact in the process that you have a constitutional duty to disclose that. Here's how we get there, Your Honor. Once Davis stepped outside of the umbrella of absolute immunity after the fourth habeas proceedings ended, and he testified that his role as an advocate ended. I'm spotting you. We're doing qualified immunity, the weakest standard, and I still What is the case? So we get outside the umbrella of qualified immunity. At that point, Davis did not just happen upon exculpatory material. He injected himself into the conversation between what would have been the court had habeas gone a different direction, but in reality was probably Moon. Davis injected himself into that conversation between Stanley... Counsel, what case says injecting yourself in the conversation somehow was be violate clearly established law? Your Honor, I'm not familiar with the case that says that precisely. Anything close to it. The cases are myriad. Give me your best one. Your Honor, I would point to this court's decision in Terry which says that the right of access must be adequate, meaningful, and effective. And when Davis put himself in the position as the go-between running the water between Stanley and Moon, he opened the door for the possibility that he would deny Moon access to the courts that was adequate, meaningful, and effective. Okay, you've saved time for rebuttal. Thank you, Your Honor. Thank you, Your Honor. Good morning. I'm Signe Niemeyer. I'm here representing the county defendants and assistant district attorney Davis. I need to make three points during my access to the court that this court lacks jurisdiction. A 1983 case requires the identification of a constitutional issue, and no such issue is present before this court. He admits this is supplemental jurisdiction. In other words, it's a state claim, pure and simple, in all of its aspects. And he's tagging on to federal jurisdiction only because there are two other claims that have a federal nexus. Are you in the county? County. Oh, I'm sorry. I'm sorry. All right. Then I misunderstood your argument. What were you saying? That 1983, you said? A 1983 case requires the identification of a valid constitutional argument that has been preserved through the court below, and there is no such argument in this case. The second one is that ADA Davis should be protected by absolute immunity in the context of this case, and that the plaintiff has failed to review his record and is not accurate on his facts, and we need to straighten some of that out. With respect... Counsel, we actually lack jurisdiction. Is that the right terminology, or are you just saying that they waived it? In order to have the jurisdiction, you have to have the access to the court claim, which is the only thing that they brought forth in their original brief to this court. Access to the court. I had never seen those words in 2,500 pages of record. There were at least seven defense attorneys. Not one person recognized that issue. Not one person briefed that issue. The court did not address that issue. It is nowhere in the pleading. As you opened the door a few minutes ago, there are pleading requirements for access to the courts. It is not enough to say, I have a right to access to the courts. You have to identify the scope of that access. What is that case or that group of cases that tells us that the underlying activity of the official was wrong? Why isn't his due process claim adequate? It's a rose by any other name would smell as sweet, perhaps, because he said in his due process claim it was about access, the factual underpinning. There's absolutely no question that the issue of due process was raised below. In count 12, it says you failed to supervise District Clerk, and this violated due process. It said that you failed to train this violated due process, that you failed to turn over evidence that you had, and this violated due process. But they were done in the context of very specific claims that were addressed on their merits. Nobody was looking at access to the courts, and when you are pleading access to the courts, you are required, besides saying, you try the issue of access to the courts. You don't try the underlying claim. You say this is what caused the problem, so that the court can make a determination as to whether or not that underlying claim is frivolous, but I would submit to you that it was frivolous. The underlying claim, of course, Mr. Moon wants to prove that he is innocent, but he had nothing to use to sue the county and prevail. His DNA evidence from the first test in 1990 was useless. It said, this was the DNA of a woman, and Moon, you aren't a woman. Give us the victim's blood, and we'll tell you whether or not this was the victim's DNA. The second test was one performed by the state lab years later, and it was equally non-helpful to Mr. Moon. It said, you have not been eliminated as the potential rapist in this case. That's what it said, and those two claims, those two DNA reports do not create a valid underlying claim for which Mr. Moon could have lost access to the corpse. Now today, for the very first time ever, I heard the explanation that had this been done differently, that Judge Woodard, who ruled on the fourth application for habeas relief, could have held a hearing and he could have done all of these different things. Judge Woodard was never mentioned in any of the pleadings below, and the record for this habeas was unlike any record I've seen. It was 75 pages long. Why did ADA Davis go to the lengths he went in this case? And the answer is the law was changing in Texas. In 1995, the legislature passed a change to the habeas statute. It was article 11.07 4A2, and that particular provision said, if a defendant produces post-conviction evidence that proves actual innocence, he must be released from prison. Shortly after that, about six months later, a case came down that was a person on death row, and the DNA in that case was used to exonerate the defendant. Mr. Moon cited that case in his petition, so John Davis knew as the state's advocate that he had to really look into this DNA evidence, and that's the reason that he called the state lab, and he said, explain this DNA result to me. Tell me what it says. That seriologist called the original lab, asked additional questions. Then they arranged for the evidence to be sent back and retested by the lab. Now, in the brief that  presented, he said that that all happened after the court had ruled on the fourth petition, but that's inaccurate. That is contained in Ms. Stanley's affidavit, and it is attached to and part of the response to the fourth petition. So, that's what initiated this. We know that that activity was protected by absolute immunity. It happened during the time that the habeas was pending, but I would refer you to a court case out of the Second Circus, and that case involves a very similar case. It's cited in Mr. Moon's brief, and it is the Warney case, and it was determined, as I recall, in Warney v. Moreau, and it was a 2009 case, and in that case, it was a little different. They were determining whether or not absolute immunity or DNA that was discovered to actually prove a person's innocence was withheld by the district attorneys for about 72 days while they did additional testing and other things, and the court was trying to determine whether to expand absolute immunity to cover the writ of habeas corpus portion of this particular proceeding. The analysis that that court went through was to ask what was the obligation of this prosecutor, and they said he had a duty not to automatically oppose, but to figure out whether on the merits he should oppose. In a similar sense, this is what Mr. Davis was doing. He requested the DNA evidence he found it. Nobody knew where it was. It wasn't in the plaintiff's hands. It wasn't in the clerk's hands. What had happened to it, no one was clear on, but it was found. It was brought back, and that day when Mr. Davis, seven months later, received the results, he had to look at that evidence. He had to think about its legal significance just the same way he had to look at the original DNA evidence while the writ was pending. But there was no ending procedure at that point. The habeas had ended. It had ended. There was no ongoing procedure. He gets the stuff in the mail, and so now he asked, what do I do with this stuff I just received? There's no life claim. Well, I think that's exactly what he had to do, because he knew if this DNA showed actual innocence, then that meant that he had to initiate that court proceeding to get Mr. Moon out of jail. It's very similar to what you have recognized in Ryland, where you say, Ryland v. Shapiro, where you say, at the very beginning of a case, when the prosecutor is looking at the evidence, they're making that quasi judicial determination. Should I file this case or should I pass on it? And similarly, he is making a decision, should I file a motion to get Mr. Moon out of jail based upon actual innocence, as is my obligation under this statute, should I pass. And because this evidence clearly did not exonerate Mr. Moon, he had to pass. With respect to the checkout document, what you have is very clear evidence in the record attached to ADA Davis' fourth response, where he goes through and he describes in great detail what happened in the trial, what happened in the previous rents. And he has evidence. You have, first, the defense attorney, Mr. Hughes, talking about, yes, I didn't send the evidence. What he did, there's also the testimony of the clerk, and it says, Mr. Hughes checked out the evidence. There is an affidavit attached from Matthew DeCoats. It says, I was there with him when he checked out the evidence. I refused to sign the evidence law. Then it says that the clerk, that the evidence box was given to the court clerk for mailing, eventually. Then it shows that the clerk quit his job. And then they couldn't find the evidence. The clerk had to call and say, come back here. Counsel, you need to wrap it up. Yes. There was an extra four minutes. Did you not get that already? I thought she got it at the beginning. You want to take their minutes? Well, to finish my sentence. Anyway, there's 40 days while this evidence floats that the clerk is responsible for the place. Finally, it is sent to the testing lab. There is a break. Mr. Moon is responsible for it. Thank you. Thank you, counsel. We're going to hear from the city next. Thank you, counsel. Our issue focuses on the statute of limitations and the accrual periods regarding the cause of action. The accrual time for Mr. Moon to file a cause of action for false imprisonment started when the legal process occurred, such as when he was arraigned or otherwise bound by a magistrate. This position is one that's supported by precedent and within the parameters fair play. As you know, Mr. Moon has argued that the court erred by not adopting the state law theory of a continuing tort with regard to false imprisonment claims so that the accrual time for a cause of action, he argues, begins after Mr. Moon's imprisonment ended in 2004. In the case of Wallace v. Cato, the Supreme Court held that the statute of limitations for false imprisonment, where the arrest is followed by criminal proceedings, as in Mr. Moon's case, began to run from the arraignment. Thus, once the defendant is held pursuant to a legal process such as arraignment or, as I mentioned, being bound by a magistrate, false imprisonment ends. Was that a Texas claim? The Wallace case, that was not a Texas claim. A Texas claim, not a Federal claim. Right. Now, in the Fifth Circuit, though, on LaValle v. Leasty, this Court, the Fifth Circuit, held that the accrual is a question of Federal law that is not resolved by reference to State law. Is that a Texas claim or is that a Federal claim? That's just on the 14th Amendment. Right, that's a Federal claim. So, for a Texas claim, have we ever held that the accrual statute that governs, or the accrual that governs, is a Federal or... Have you cited to us any authority that says the accrual rules for Federal claims apply to Texas claims? Yes, I have. What case says that? Well, Your Honor, what I'm saying is that we are citing this Court in reference to any time we are taking a statute of limitations by a State. The accrual aspects of any of that are always in the Federal realm. By the State arguing a continuing tort within the Texas realm, because some other courts have talked about that, they are getting into the accrual aspects of the case, whereas their role is limited to coming up with a statute of limitations. That's their role. That's what the Federal court looks at whenever they get involved in the Federal realm, in this case, a lawsuit in Federal court. But this is not a Federal claim, though. Do you understand that? They file two claims. There's the one under the 14th Amendment, and then they're over here talking about the State. We're talking about his State law. He only appeals his State law cause claim for dismissal of the 1983. He didn't appeal the 1983. Correct. So he's only appealing a State law claim. First of all, the Texas Supreme Court has never clocked that in on the continuing tort. They bring that issue into their Federal lawsuit. They inject it within the Federal realm. This is not a Federal lawsuit. Your claim is not. But they're bringing it into the Federal lawsuit as one of their issues. But you have no Federal jurisdiction over that claim. Either they're going to want this court to address, that is, by this court, the Federal courts to address their State claim. You have supplemental jurisdiction over it, not original jurisdiction. Right. But I don't believe that anything that the court had done by dismissing this case under 12b-6 was in any way, shape, or form something that they were not legally able to do. Now, whether it's doing away with it and letting it be a supplemental situation or remanded, I won't speak to that. I'm only speaking to the fact that they brought it into the suit. This court dismissed the case, failed to state a claim where the Federal court can actually come and do something with it. And now they're bringing it up and appeal again back within the case. They're bringing a concept of continuing tort that's a Texas ideology that's not even been adopted necessarily by all courts. Some courts have done it. But not even the Texas Supreme Court has locked it in as this is our rule here in Texas. Counsel, you've used your time. You need to wrap it up. I'm going to go ahead and allow Mr. Pierce to continue with his time. He's also going to address some of these issues. Thank you. Thank you, Your Honor. May it please the Court. I'm David Pierce, and I represent officers Jeffrey Dove and Sal Olivares. First, I want to comment on the idea of demanding this case for consideration by Judge Garcia. Questions asked by the court. This continuing tort theory was never raised at the trial court. It wasn't pleaded, and it wasn't argued in response to the 12B6. And for those reasons, it was not addressed by Judge Garcia. Further, Your Honor, there were questions asked about Texas state law and the continuous tort theory. It is far from clear that the continuous tort theory is recognized by Texas at all. There is one case, Adler, which identified it, and from that, seemingly all other cases have sprung. Adler was a very peculiar case. It was a mental institution confinement. It lasted 24 hours, and the question before the court was a case that was filed two years from the second day of confinement. Is that timely as to the individuals who instigated the confinement? The court's main reasoning was that it was not because of what we now think of as the continuing tort theory, but because the individual was held without access to legal representation. In fact, the court used the word incommunicado. So if you read the Adler opinion, it really says that if you are held without recourse to legal resources for a period of time, you are disabled under the Texas statute of limitations, and it should be extended to cover the end of your disability. From that, other cases, the Upjohn case, which the appellant's site is a halcyon, a it has nothing to do with false imprisonment and whether taking drugs over time when the cause of action accrues. The Cronin case, which they cite, was actually filed within the two-year statute of limitations, but the court gratuitously identified the continuous tort theory. The Thoreau case was a hospital false imprisonment case where a woman had a child transferred, and she alleged, even though she missed the statute of limitations by three months, she alleged that her 4590I letter extended the statute of limitations, which the court denied, but during the course of the analysis again, they gratuitously mentioned the continuous tort theory. And finally, the Jackson case, the plaintiff missed the statute of limitations by three years, and again, for no reason, the court identified the continuous tort theory. So the only case that ever actually held continuous tort was one single intermediate court case, the Adler case. More notably, the ExxonMobil versus Rincones case, which just came out last year from the Texas Supreme Court, specifically indicated that we have not accepted, we have not written on this theory. We acknowledge that there is this theory out there. They did not apply it to the case before them. It did not offer any relief to the litigants, but most importantly, they articulated the elements of the theory. The doctrine of continuing tort is rooted in the plaintiff's inability to know that ongoing conduct is causing him injury. That absolutely cannot apply to a false imprisonment case. So it's very unlikely that when the case is squarely before the Texas Supreme Court, they will adopt that theory. Have you even argued that in your brief? You're right. You didn't argue an eerie guess and whether an intermediate court, you didn't argue that. Instead, you argued federal accrual. I argued that this court should not accept the continuous tort for the application of a state law false imprisonment claim. I did not... You didn't do any eerie analysis. No. It's a matter of to my knowledge, it's entirely up to the prerogative of this court what accrual date to apply, whether it be state or federal. Even if this was state law, it would not be binding on this court. And there are good reasons why this court should not accept it, even if it were state law. It would be inconsistent with the 1983 law, so that you would have a different accrual date for a false imprisonment brought under 1983 than a false imprisonment under state law. Sure. In what case says that's not appropriate? Well, it just creates inconsistency in the application of false imprisonment law. Well, the plaintiff gets to pick whether they come to us or go to the state and have a state claim. Understood. I would briefly like to answer the court question of whether you have ever decided this. Not in so many words. You have ruled several times that state courts' false imprisonment claims accrue when the You have a red light there. Thank you. I didn't say you had to quit. I just You have a I have several. They're cited in my brief. Anything that's not in your brief? There is one. Manuel versus I'm sorry? Did you provide it to the other side? It's in their brief. It's Manuel versus Lemberg, and it's cited in a footnote on page 31 of the appellant's brief. Thank you, counsel. We have your argument. May it please the court, there are three things I'd like to address in rebuttal. First, Judge Elrod, you are correct. In the detective's briefing, they conceded that the continuing tort theory is the law of Texas and that a cause of action for false imprisonment accrues upon Which one of the defendants conceded? Tell me which defendant conceded that continuing tort applies. Detectives who are A detective conceded it? The detective, Dove, and the city defendants. Yes, Your Honor. Detective Dove and Olivares. At page 7 of their brief, they say Not the lawyers. Know what you're saying? No, the lawyers for the detective. Yes, Your Honor. In this brief, they conceded that continuing tort applies in Texas. Well, it doesn't matter. It either does or it doesn't. What they conceded doesn't make any difference ultimately. I suppose we will decide that issue. And Your Honor, to clarify on what is the theory, the policy purpose underlying the application of the continuing tort doctrine in Texas, it's really not what counsel just described. The theory is this. In Texas, when a person is falsely or wrongfully imprisoned, it's not that they don't know they're being harmed. It's that Texas regards the cause of that harm as an ongoing cause that occurs anew each day and that on any given day, the person suffering that harm cannot tell in the future when that harm will cease. What do you have to say about the argument that out of 20,000 pages of record and brief, they don't find the word access to the courts? Your Honor— And that now they're hearing it for the first time, they say. Your Honor, a couple things on that point. First, if this court—first, Moody's not required to provide an eloquent and elaborate and detailed articulate theory of every possible legal claim that he wants to bring. The law requires a short and plain statement. Here are places in his complaint where he met that standard. First, he pled at paragraph 79. This is as to the county defendants. The clerk did not have a proper system in place to keep track of and document evidence. Then at paragraphs 97 and 98, the clerk had no process to preserve the chain of custody, and Moon's incarceration was prolonged as a result. That's as to the county defendants. As to ADA Davis, at 78 of the complaint, quote, Davis failed to inform Moon that testing was done in 1996 and of the request for follow-up samples. Moon was deprived of due process under the 14th Amendment, and at paragraph 44, that error caused him to remain incarcerated until 2004. He may not have used the magic words access in the complaint. Those words could apply to various theories of law and causes of action. That's true, Your Honor. So you pick out one that nobody's ever heard of and apply it here, and you didn't raise it down below. It merits noting that the district court understood the gist of the right of access argument. The district court said plaintiff claims that these defendants thwarted attempts to secure additional DNA testing and violated his due process rights by slowing down the process for him to get exonerated. That's the essence of his right of access claim. It's that he could have been free in 1996, but they slowed that process down by their various failures, and he ultimately was exonerated only eight years later. That's the gist of the right of access argument. Thank you, Your Honor. Your Honor, as to the state law claim against the city defendants, this is a straightforward, pure legal question of application of Erie, and we would request that this court address that question now respectfully. Moon pleaded statute of limitations does not apply at paragraph 133 of the complaint, and judicial economy suggests that the fact that this suit has been pending for 10 years already, in light of judicial economy, we would respectfully request that this court answer that legal question and remand for further proceedings. Thank you. Thank you. We have your argument. This concludes the oral